TIBBALS FLOORING COMPANY, INC., Plaintiff-in-Error,

*v.*

MITCHELL STANFILL, Defendant-in-Error.

410 S.W.2d 892.

(*Knoxville,* September Term, 1966.)

Opinion filed January 6, 1967.

Don C. Stansberry, Jr., of counsel, Baker, Worthington, Barnett & Crossley, Huntsville, for plaintiff in error.

Charles W. Martin, Oneida, for defendant in error.

MR. JUSTICE CHATTIN delivered the opinion of the Court.

This is a workmen's compensation case. The trial judge found the petitioner, Mitchell Stanfill, had suffered an injury arising out of and in the course of his employment with the defendant, Tibbals Flooring Company, and as a result was permanently and totally disabled. Benefits were awarded accordingly.

After defendant's motion for a new trial was overruled, an appeal was perfected to this Court and errors have been assigned.

The first assignment has for its basis there is no material evidence in the record to support the finding of the trial judge the injury arose out of and in the course of petitioner's employment.

The facts are that petitioner was employed by the defendant for approximately six years prior to June 4, 1965.

He was fifty-six years of age at the date of the trial on March 10, 1966. He was in good health at the time he began working for defendant in 1958.

Petitioner's work consisted of taking strips of lumber from a cut-off saw, cutting the ends off the strips, and then placing the strips on a conveyor belt which conveyed the strips to another machine. The work was done in a room of the lumber mill. He worked eight hours a day. The work required constant motion on his part in removing the lumber from the saw and placing it on the belt.

Petitioner continued to enjoy good health until about eighteen months prior to April 23, 1965. During this

period, petitioner experienced pains in his chest, dizziness and weakness during his work hours and also while off from work.

On April 22, 1965, petitioner and his son went into the country to target practice. When they reached the place they intended to practice, their car was parked and when petitioner got out of the car his heart began to beat "hard." At the insistence of his wife and son, he went to see Dr. Milford Thompson.

Dr. Thompson diagnosed petitioner's condition as an auricular fibrillation. That is, he had an irregular heart beat and shortness of breath.

Petitioner continued to work until the first part of June, 1965. At that time he was told by Mr. Charles Tibbals, the President of the Company, that he would be separated from his work.

Mr. Tibbals testified Dr. Thompson had told him that petitioner had a rapid heart condition which was associated with high blood pressure. That when he was advised of petitioner's physical condition he told petitioner the Company had decided it best to separate him from his employment.

Dr. Thompson testified on direct examination as follows:

"Q. And what were your findings?

"A. When I saw him on the first day, he had what I thought was an auricular fibrillation. His heart was completely irregular. There was no blood pressure obtainable on that date. And he gave me a history of having had some high blood pressure. And for several

days he had had an irregular heart beat and had a feeling of shortness of breath.

"Q. Did he also tell you where he was employed?

"A. He did.

"Q. And was that Tibbals Flooring Company?

"A. Yes.

"Q. Did he describe his work at Tibbals?

"A. I asked him.

"Q. And based on your examination, did you make any recommendations to Mr. Stanfill?

"A. Well, I saw Mr. Stanfill on the following day, and every two or three days for about a month. During that time his complete arhythmia of his heart returned to a normal rhythm, and his blood pressure then when he had a normal rhythm was 180 over 100, and it varied from one examination to another, but usually stayed around 170 over 100 or so, and in about July or August, after observing him over this period of time and his complaint that he was tired and that he was having difficulty in holding up his job, which is mainly light inspection and so forth, I advised him to stop work, since I thought it was putting too much stress and strain on his cardiovascular system.

"Q. Then it was your opinion, based on his history and examination, that continued work would have an adverse effect?

"A. Observation over a period of three months, before I finally decided that regular work that he was doing was a little bit too much for him.

"Q. Did you prescribe medication?

"A. Yes.

"Q. And as a result of the medication, did you have occasion to examine him after taking this medication?

"A. Yes, for three months.

"Q. And did that seem to alleviate his condition?

"A. Yes, he improved under medication. But it didn't alleviate all of his symptoms, that he was excessively tired, and that when he did a full day's work that he just barely could go, and that he was short of breath.

"Q. Is it your opinion, based on his history and examination, that medication was essential to maintenance of—

"A. Yes.

"Q. Doctor, in your opinion, would the fact that a person engaged in an activity where his hands and parts of his body were in motion for an 8-hour period, or practically an 8-hour period, would that have an adverse effect upon his heart?

"A. Yes.

"Q. Are you continuing to see Mr. Stanfill?

"A. Yes. As a matter of fact, I saw him on the 11th of this month, and I have seen him regularly since his first visit.

"Q. In your opinion, will his heart condition continue to be with him throughout his life?

"A. Yes.

"Q. Then the treatment of rest and medication, then, would have the effect of alleviating, rather than clearing up or curing his condition? Is that a correct statement?

"A. That's right. Yes, sir.

"Q. In your opinion, if he resumed a physical activity such as that which he was doing for Tibbals, would that, in your opinion, have an adverse effect?

"A. Yes."

On cross examination, he testified:

"Q. In your opinion, has this man suffered a heart attack?

"A. No.

"Q. What would be the correct description of his experience he had when his heart ran away with him?

"A. What I saw on the day he came in was completely irregular heart beat, which, with no blood pressure obtainable, was typical of what we term auricular fibrillation.

"Q. And is that not the most serious difficulty he has had?

"A. Yes.

"Q. And has he or not been recovering from that ever since?

"A. Yes.

"Q. Doctor, in your opinion, based upon your knowledge of what sort of work he did, was this condition caused by his employment?

"A. No.

"Q. In your opinion was it aggravated or made worse by his employment?

"A. I wouldn't think so."

On redirect examination he testified:

"Q. Now based on your opinion, could a heart condition be brought on by constant physical exertion of the type that this man engaged in?

"A. No, he would have to have some basic fault before you could see it was due—he has a basic fault, because you have other men of the same age and everything, who are doing as much or more work per day than he is, and they don't have heart disease.

"Q. By basic fault, you mean that he would have to have a heart condition?

"A. That's right.

"Q. But then assuming that to be so, then this type of activity would aggravate ——

"A. This man had a heart condition. The most common reason for it is hypertension and some arteriosclerosis. This is a problem that comes with aging of the vascular system. This varies a great deal. Some people may manifest these things at a much earlier age than others.

"Q. Then would exertion or physical activity have any effect on this condition?

"A. Yes.

\*     \*     \*     \*     \*     \*

"Q. Is it your opinion that his heart would be in better shape by not working than by working?

"A. That is the reason that I advised him to stop work was that I thought he would do better not working."

On recross examination he testified:

"Q. Doctor, this man described to you the type of work he did, and that has been characterized by you as relatively light. In your opinion, did his activities in connection with his employment aggravate this heart condition which he had any more than just the—

"A. I would say, no more than the usual wear and tear.

"Q. And the exertion required to come and go and carry on normal activities, would do about the same amount of damage?

"A. Yes.

\* \* \* \* \* \*

"Q. Doctor, one more question. You have stated that you did advise him to quit work. And I will ask you, was that or not largely based on the desire to prevent future harm rather than because he was no longer able to work?

"A. That's right. I was looking out for the man."

It is the insistence of the defendant that since Dr. Thompson testified that petitioner's heart condition was not caused or aggravated by petitioner's work there is no material evidence in the record to support the finding of the trial judge there was a causal connection between petitioner's heart condition and his employment.

To meet this insistence, Counsel for petitioner insists that since Dr. Thompson also testified that petitioner's

work would have an adverse effect on his heart there is material evidence to support a finding of a causal connection between petitioner's work and his heart condition.

If this testimony of Dr. Thompson is to be construed as meaning petitioner's work caused or aggravated petitioner's heart condition, then his testimony is inconsistent with his testimony it did not cause or aggravate his heart condition.

■ Contradictory statements of a witness in connection with the same fact have a result of cancelling out each other. *Donaho v. Large,* 25 Tenn.App. 433, 158 S.W.2d 447, 448 (1941); *Todd v. Roane-Anderson Company,* 35 Tenn.App. 687, 251 S.W.2d 132 (1952).

■ Thus, there is no medical proof in the record that petitioner's heart condition was caused or aggravated by his employment.

■ The medical question, under the facts of this case, whether petitioner's heart condition was caused or aggravated by his employment, is a complicated one and carries the finder of facts into realms which are properly within the province of medical experts. *American Enka Corporation v. Sutton,* 216 Tenn. 228, 391 S.W.2d 643 (1965).

In the instant case, the only question is whether there was a causal connection between the work petitioner was performing and his heart condition.

The petitioner testified he experienced the symptoms of his heart condition while away from his work as well as when he was at his work; and that his condition worsened as time passed.

We do not think an inference may be drawn from this testimony that petitioner's work caused or aggravated his heart condition which resulted in his disability, and excludes an inference his heart condition was caused by other sources and his disability resulted from the normal progress of that condition.

If, upon undisputed proof, it is conjectural whether disability resulted from a cause operating within petitioner's employment, or a cause operating without his employment, there can be no award. *Hagewood v. E. I. Du Pont de Nemours & Co.,* 206 Tenn. 239, 332 S.W.2d 660 (1960).

We think it was necessary under the particular facts of this case for the petitioner to show by competent medical testimony the employment caused or aggravated his heart condition and his resulting disability was not due to the normal progress of that condition or ailment.

In the case of *American Enka Corporation v. Sutton,* supra, this Court approved the following principle:

"[T]he increasing tendency to make awards unsupported by medical testimony should not be allowed to obscure the basic necessity of establishing medical causation by expert testimony in all but simple and routine cases—and even in these cases such evidence is highly desirable."

From our view of this record, we are unable to find any material evidence upon which a finding for the petitioner could be based.

In view of what we have hereinabove said, we think it is unnecessary to discuss defendant's second assignment

of error which contends petitioner failed to give the proper notice of the alleged accident.

The cause is reversed and dismissed for lack of competent material evidence to show a causal connection between petitioner's employment and his heart condition.

Burnett, Chief Justice, Dyer and Creson, Justices, and Harbison, Special Justice, concur.