CONSOLIDATED ALUMINUM CORPORATION and SECURITY
INSURANCE COMPANY of Hartford, Plaintiffs-in-Error,

*v.*

JIMMY D. HARPER, Defendant-in-Error.

465 S.W.2d 727.

(*Nashville,* December Term, 1970.)

Opinion filed April 5, 1971.

Thomas H. Rainey, Spragins, Menzies & Rainey, Jackson, for plaintiffs in error.

William A. Derington, Jr., Camden, for defendant in error.

Mr. Justice Creson delivered the opinion of the Court.

This is an appeal from a judgment of the Circuit Court of Humphreys County, granting Jimmy D. Harper, Workmen's Compensation benefits. The trial court awarded defendant in error Workmen's Compensation benefits in the sum of $42.00 per week for ten weeks for temporary total disability; $42.00 per week for one hundred weeks for permanent loss of vision in his left eye, and a sum for medical bills incurred, said sum to be agreed upon by both parties.

In the course of this opinion the parties will be referred to as they appeared in the court below; that is, Jimmy D. Harper as petitioner, and Consolidated Aluminum Corporation and Security Insurance Company of Hartford as defendants.

Petitioner became employed with Consolidated Aluminum Corporation on July 26, 1967. Prior to that date he underwent a physical examination by the company doctor and was found in good physical condition, with no impairment of his eyes. On the first day of work, July 26, 1967, petitioner was assigned to work close to the "pots". Testimony revealed that these "pots" were electric furnaces which generated heat of some 1700 to 1800 degrees Fahrenheit. Petitioner's particular job was to remove waste materials, which he described as burned carbon blocks, from these furnaces. Petitioner testified that he wore long sleeves, a safety helmet, and clear safety goggles.

Petitioner further testified that he worked twelve hours that day, from 7:00 o'clock A.M. to 7:00 o'clock P.M., and that during the course of the day he felt a burning sensation on his face; he testified that it was very hot and that he was not used to working in such a hot place. Further testimony was to the effect that when petitioner got home that night his face was very red; his eyelids were swollen, the left eyelid more swollen than the right; that he complained of pain; that he did not eat supper but took a bath and went to bed; and that upon waking the following morning he did not go to work because of swollen eyelids and a burning sensation around his face.

The testimony of petitioner, his wife and his brother, was to the effect that on the 28th day of July, 1967, he

was still unable to return to work, but that his brother drove him to the plant where he informed his foreman, Mr. Bryan Hall, of his injury and was advised by Mr. Hall to go to the hospital. Petitioner's brother then drove petitioner to see Dr. Capps, in Waverly, Tennessee. Dr. Capps was puzzled by petitioner's condition and advised him to go to Nashville and see Dr. John R. Smith, an ophthalmologist. The following day, on July 29, 1967, petitioner saw Dr. Smith in Nashville, and Dr. Spencer Thornton, also an ophthalmologist, whose office was in the same building with Dr. Smith. Dr. Smith advised petitioner to enter a hospital in Nashville; however, petitioner refused to be hospitalized in Nashville and requested to enter a hospital in Dickson, Tennessee. Upon entering the Goodlark Hospital in Dickson, petitioner was treated by a family doctor, Dr. James Jackson. Petitioner stayed in the hospital only a few days; then, over Dr. Jackson's objection, insisted on going home. While in the hospital, his vision in his left eye improved; however, upon returning home, it became worse, and eventually petitioner lost sight in his left eye.

On October 23, 1967, petitioner returned to work for defendant, Consolidated Aluminum Corporation, and has worked since.

The depositions of three doctors were taken and submitted to the court below for review. Dr. James Jackson stated in his deposition that he was a general surgeon and had no special education with regard to eye diseases. In fact, Dr. Jackson was very honest in noting several times his lack of expertise in the field of ophthalmology.

"Q. Dr. Jackson, how much formal training have you had with regard to treatment of the eye?

A. None.

\* \* \* \* \* \*

Q. Did you see any maculae scar in this patient's left eye?

A. I didn't. I wouldn't call myself an expert on that.

Q. Can a patient develop clorioretinitis or maculae iritis in a very short period of time, couple of days?

A. Well, I wouldn't make a statement on that, I am not experienced enough to say, but I would certainly—I don't see why it couldn't. I see no reason at all why it couldn't.

\* \* \* \* \* \*

Q. Have you personally ever treated a case or read of a case of clorioretinitis having been caused from heat or light?

A. Well, no, I haven't—I'm not an expert in this field and I wouldn't want to venture any statement on that.

Q. Are you familiar with a medical work on retinal diseases known as Duke-Elder's System of Ophthalmology?

A. No."

It was his diagnosis, however, that petitioner was suffering from maculae retinitis, which he described as eye inflammation. Dr. Jackson stated that he first saw petitioner on July 29, 1967, and, at that time, petitioner told

him that he had injured his left eye while at work for Consolidated Aluminum Corporation, and that he was unable to see anything from his left eye. Dr. Jackson stated further that he had been a family doctor for some time and, to his knowledge, petitioner had no prior impairment of his eyes. Upon being asked the question as to whether or not petitioner's exposure to the intense heat and light while working near electric furnaces could have aggravated a prior disease in his left eye, Dr. Jackson stated that he was of the opinion that it could. In addition, however, Dr. Jackson's testimony continued as follows:

"Q. Speaking logically, and we can let the ophthalmologist express his opinion, but you have a right to express your opinion, too, do you feel that this condition was brought on by the man's employment?

A. Like I say, putting together—as the family physician, I was never aware of any problem in his left eye. And his wife, who is a very intelligent woman and I've got no reason to doubt her word, said he had never had any problem with his eyes as far as she knew.

And the fact that he had been employed—according to his statement, to me, now, had been told he had 20/20 vision, you know, just shortly before this, and the fact that he went to the Doctor immediately thereof, and complained of his total loss of vision—he had total loss of vision— I would have to assume that whatever the underlying problem was in his eye, that the blindness was precipitated by this—on this date that he told us.

Q. In the course of his employment?

A. I would just have to assume that.

Q. You mean by assuming, that's your opinion?

A. Yes, I have no—nothing else to base it on."

Dr. John Smith's deposition was to the effect that petitioner had an eye disease called chorioretinitis active, with some scarring of the retina; that this condition could not appear suddenly but that it would take several weeks to develop; that it was his opinion the petitioner's chorioretinitis was present in his left eye before July 26, 1967, because the lesion and pigmentation that was present when he, Dr. Smith, observed petitioner, takes a considérable longer time than three days to develop; and, further, that petitioner could have such scarring on his retina without noticing it because the position of the scar would not affect his central vision. Dr. Smith further stated that he measured the pressure in both eyes and found that the pressure in petitioner's left eye was lower than that in his right eye, indicating inflammation in the left eye, and that it was his opinion "the active lesion was over two days old." Dr. Smith stated that the type lesion that he observed would not come from the type burn experienced by petitioner; however, Dr. Smith did not express an opinion on whether the burn experienced by petitioner would aggravate the chorioretinitis in petitioner's left eye. Finally, Dr. Smith was unable to explain the meaning of the term "maculae retinitis", the descriptive diagnosis given by Dr. Jackson, and flatly said that he had never heard of it.

Dr. Spencer Thornton expressly stated in his deposition that he was in full agreement with Dr. Smith's diag-

nosis of chorioretinitis active, with scarring of the retina. Dr. Thornton's deposition states, in part:

"A. The patient stated to Dr. Smith in my presence that he injured his eye at work and all the problems that he had developed immediately after the injury. He stated that he had had his vision checked two or three weeks or sometime recently prior to the accident, and that it was perfectly normal. However, in my experience, visual loss to the point of total blindness as a result of chorioretinitis just does not occur in this short length of time, nor does pigmentation occur to the degree that he had it in this short length of time, nor is it probable that a man looking at the light that he claims to be responsible for his injury, not to have any involvement in the opposite eye.

Q. Do you have an opinion as to whether or not the condition that you found on July the 29th, 1967, existed prior to July the 26th, 1967?

\* \* \* \* \* \*

A. I would say in my opinion that this lesion had to be present prior to three days which was the time that we examined him. I do not believe that a lesion of this extent with total blindness, no involvement of the opposite eye, could have caused this much damage in the time he stated.

Q. Why is this? Why do you have such an opinion?

A. The lesion was limited to the posterior pole, the visible lesion. The man denied light even when light was directed off of the lesion in the peripheral retina. You can easily demonstrate that

vision remains in the portion of the eye not involved by simply holding your hands in front of your eye and blocking out vision. If you move your hands to the side, you still see it, even with a cataract or an injury in the retina, the total absense of light perception, which he claimed just does not happen only as a result of chorioretinitis.

It could result from damage to the optic nerve, an optic neuritis or inflammation of the optic nerve in which there is swelling of fibers of the optic nerve to block all sensation coming from the entire retina. It could happen from a lesion in the brain. It could happen from many other things, but not just from a central posterior chorioretinitis.

Q. Was there anything else to indicate to you that this condition that you found in Mr. Harper's left eye on July the 29th existed prior to July 26th, 1967?

A. Other than the points that I mentioned, I can think of nothing more specific. We have to accept the history as given by a patient as the basis for our initial examination and diagnosis. The probability of 20/20 vision prior to the type injury he claims to have sustained is the thing that first of all brought it—this case from Dr. Smith's office to mine. It's most unusual.

Q. Would you say that it would be probable or improbable?

A. Highly improbable.

Q. What significance did you place upon the lesion that you observed in his left eye as it regards to the time element here, that is, the three days between the alleged time of the injury and the time that you saw him?

A. Those of us who have done light coagulation or surgery of the eye have seen pigmented lesions begin to develop within a week to ten days to the point where you can see the haze and the vitreous as a result of high intensity directed light. I should parenthesize that. You don't get total blindness from this lesion even when fully developed, but the lesion itself takes more than three days to develop.

Q. The lesion that you saw would have taken more than three days to develop?

A. Yes. I should mention, too, that if his blindness is caused by optic atrophy, the condition termed optic atrophy does not occur just like that, immediately. It takes several weeks to occur. The only thing that would cause total instantaneous blindness with the involvement of the optic nerve would be something that severed the nerve or crushed the nerve.

Q. Anything that would cause—

A. (Interposing). To have total permanent blindness within three days would have to be virtually a disaster to the optic nerve or even farther back in the brain.

Q. Did you see any evidence of trauma or—to this eye?

A. None, no, sir.

Q. Was there any history of an injury to the head or from an external blow?

A. No, sir.

Q. Was there any injury or damage to the anterior portion of the eye?

A. No, sir. I beg your pardon. You said injury.

Q. Trauma?

A. Trauma, no. * * *''

Further, in answer to a question by defendant's counsel as to what is the meaning of maculairitis, the condition in petitioner's left eye as diagnosed by Dr. Jackson, Dr. Thornton replied, ''There is no such thing as maculairitis, no such thing.''

The trial judge, in a memorandum opinion, concluded that while Dr. Jackson was not an expert in the field of ophthalmology, his testimony must nevertheless be considered medical opinion and not lay opinion. The court evidently disregarded the depositions of Dr. Smith and Dr. Thornton, and ruled that petitioner's exposure to the extreme heat and strong light radiated by the electric furnaces aggravated any existing disease in his left eye, thereby resulting in an accidental injury and subsequent loss of sight in that eye.

Defendant, Consolidated Aluminum Corporation, filed a motion for new trial, which was overruled, and has prayed for and perfected an appeal in the nature of writ of error to this Court.

Defendant's assignment of error is that there is no material evidence to sustain the trial court's conclusions and judgment, because the court erred in accepting lay testimony and testimony of a general surgeon on the question of causation; disregarding the testimony of two ophthalmologists. The trial court was in error in finding that petitioner sustained an accidental injury arising out of and in the course of his employment when there was competent evidence that the pre-existing condition in petitioner's left eye was caused by a disease process which did not arise from an employment risk, nor was it aggravated, nor did it qualify as an occupational disease. We do not agree with the contention first stated in this assignment of error with respect to the testimony of a general physician or surgeon on a question of causation. Nonetheless, our disagreement in this respect is not effective to change the conclusion we must reach.

The only purpose of a factual review by this Court in cases of this nature is to determine if there is any competent material evidence to support the trial court's judgment. We are unable to find any in this particular case, with respect to causation of permanent loss of use of the eye. This, however, does not resolve the question of temporary disability, which will be commented upon a little later.

It is evident that the only issue presented here is whether petitioner's resultant permanent blindness in his left eye was causally related to his employment. This being the issue, pathology, the expert medical testimony in the field of ophthalmology, becomes the dominant factor. On critical examination, the process of assumption which Dr. Jackson candidly and repeatedly enunciates, simply cannot be said to equate an expert medical opin-

ion based upon utilization of medical science with the reasonable medical certainty. We cannot disregard the depositions of Dr. John Smith and Dr. Spencer Thornton, both acknowledged ophthalmologists, to the effect that petitioner's left eye was in a diseased condition, called "chorioretinitis active", prior to July 26, 1967; that said disease must progress over a period of several weeks before it results in total blindness in the eye; and that petitioner's exposure to intense heat and light on the job simply could not cause chorioretinitis, nor cause his loss of vision in the left eye.

■ For reasons stated herein, we can only conclude that the material evidence of the qualified medical witnesses in this case on the pivotal question of causal connection between permanent injury and employment interdicts the award made to the petitioner by the trial court. The law of this State is to be found in the previous decision of this Court in *American Enka Corporation v. Sutton* (1965) 216 Tenn. 228, 391 S.W.2d 643. This is an opinion written by the late and muchly lamented Justice Weldon White. The significance which must be given here to the testimony of Drs. Smith and Thornton is clearly and forcefully delineated in that opinion. Likewise, the lack of probative value of the testimony of Dr. Jackson is enunciated with equal clarity. See also *Tibbals Flooring Company, Inc. v. Stanfill* (1967) 219 Tenn. 498, 410 S.W.2d 892; *Ferguson v. Tennessee-Carolina Transportation Co., Inc.* (1968) 221 Tenn. 557, 428 S.W. 2d 783.

■ As it appears heretofore, the trial judge allowed some ten weeks of total temporary disability, plus medical expenses incurred. This disability is causally related to the employment by the evidence in the cause. For this

reason we must affirm the trial court's allowance of recovery of total temporary disability and medical benefits.

It follows, therefore, that the judgment below is reversed in part and affirmed in part. Judgment may be entered in this case in accordance with the opinion; assessing the costs of the cause against plaintiffs in error.

DYER, CHIEF JUSTICE, and CHATTIN, HUMPHREYS and McCANLESS, JUSTICES, concur.