Ethel S. BEARDEN, individually and
as natural guardian of Pamela
Marie Frye, Plaintiffs-Appellants,

Willie M. Davis, natural guardian and
next friend of Demetria Lynn
Bearden, Intervening-Plaintiffs,

v.

MEMPHIS DINETTES, INC., and
Travelers Insurance Company,
Defendants-Appellees.

Supreme Court of Tennessee,
at Jackson.

July 2, 1984.

Herman Morris, Jr., Memphis, for plaintiffs-appellants.

James L. Kirby, Memphis, for defendants-appellees.

## OPINION

LLOYD TATUM, Special Justice.

This is an appeal by the plaintiffs below from a judgment denying death benefits under the Worker's Compensation Act. The suit was brought by the widow and next friends of two children of the deceased, Lynn C. Bearden, alleging that Mr. Bearden was killed as a result of an accidental injury sustained out of and in the course of his employment for Memphis Dinettes, Inc. Travelers Insurance Company is the worker's compensation insurer. The trial court found that the plaintiffs did not "carry the burden of proof to establish" causal connection between the incident involving Mr. Bearden's death and his employment.

The appellants say that the trial court erred in holding there was no causal connection between the employment and the alleged accident. They also state that the court erred in refusing to allow them to argue the merits of the case at the close of proof, that the court erred in holding that certain hypothetical questions contained facts not in evidence, and that the court erred in not taking judicial notice of the temperature of a "heat box" and the temperature inside the defendant's plant at the time the incident occurred. We find no merit in the issues and affirm the judgment below.

■ We first address the issues questioning whether there was causal connection between the death and the employment. Where there is a conflict, we must view the evidence in the light most favorable to the party that prevailed in the trial court—the employer. T.C.A. § 50–6–225(e); *Johnson v. Anderson,* 188 Tenn. 194, 217 S.W.2d 939 (1949); *Vester Gas Range and Mfg. Co. v. Leonard,* 148 Tenn. 665, 257 S.W. 395 (1923).

The deceased employee, Lynn Bearden, was employed by Memphis Dinettes, Inc. on two separate occasions, the first time for six years. On October 23, 1978, when the alleged accident occurred, he had been reemployed for about two years. The deceased smoked about one package of cigarettes each day and he was a "heavy drinker." He had a history of high blood pressure and headaches.

On October 23, 1978, the deceased was a supervisor of the "Seat line," which is an assembly line that makes chair seats for dinette sets. The seat line is located at a long table in the center of an unpartitioned building that is approximately 150 to 175 feet wide and 300 feet long. His duties were to oversee the assembly line, to see that each station was properly supplied, and to work at the various points along the seat line whenever he was needed. During a normal routine day, Mr. Bearden worked at several points on the line, doing "a little of this and a little of that."

On October 23, 1978, Mr. Bearden worked his usual job. The work load on this day was normal, with no unusual problems. He took his regularly scheduled afternoon break from 2:30 P.M. to 2:40 P.M. on the dock with other employees. After

the break, he worked on the assembly line placing seat covers over seat rings (the frame of the seat). This job involved putting the seat covers over the seat rings and then passing the seat rings across the table where Mrs. Louella Pree would put the poly-foam in the seat. This was light work and involved no stress. When the covers were cool, it was necessary to warm them so that they would become soft and pliable and would fit easily over the seat rings. The covers were warmed by means of an enclosed box which was approximately 2½ by 4 feet; it had an aluminum top and contained 3 or 4 heat bulbs which were directed at the aluminum top. Before the seat covers were placed on the ring, they were placed on the aluminum top so as to absorb heat. This box generated "very, very little" heat into the area around it. The temperature at 1 foot away from the box to 10 feet away from the box varied only from 1 to 2 degrees. One could place his hands in contact with the box for several minutes without being burned.

The deceased worked less than 20 minutes after his smoke break putting the covers over the seat rings. As he was standing and observing the seat line, he slumped to the floor. The evidence was conflicting as to whether his head bumped the table as he slumped to the floor, but the evidence is undisputed that if his head did hit the table, no injury resulted that contributed to his death.

When Mr. Bearden slumped to the floor, the witness Louella Pree immediately went to him. She then ran and told Mr. James T. Smith, the plant superintendent. Mr. Smith immediately went to the office and telephoned the fire department ambulance service. He then went to the seat line where Mr. Bearden was lying on a low table. Oxygen was administered. The ambulance "came right on" and arrived in "a few minutes." Paramedics worked with Mr. Bearden for 6 or 7 minutes before taking him to the City of Memphis Hospital. His condition became progressively worse and he expired on October 30, 1978.

The temperature at 3:00 P.M., the approximate time of the collapse, was 76° F. The plaintiff's witness, Louella Pree, testified that it was a cool day and that she had worn her jacket that morning. It does not get "real hot" in the building. It was cooler inside the building than on the outside. There were two "real big" fans in the vicinity and a smaller fan.

The medical evidence presented by the plaintiffs on the issue of causation consisted of the testimony by deposition of Dr. Nathan Salky, a cardiologist. Dr. Salky reviewed the medical records and remembered that he saw the deceased by chance in the City of Memphis Hospital when making teaching rounds. Dr. Salky testified that Mr. Bearden collapsed at work and was taken to the City of Memphis Emergency Room. When examined in the hospital, the deceased had severe neurologic impairment. He was deeply comatose with neurologic signs indicating severe brain damage which was primary or secondary to cardiac arrest. He was not getting enough blood flow to the brain. Dr. Salky thought that the cause of death was anoxic encephalopathy, a brain death. It was his clinical impression that the anoxic encephalopathy had been precipitated by a cardiac arrest, a term which Dr. Salky defined as defective heart pumping or a serious irregularity of the heart pumping, preventing the heart from pumping enough blood to maintain sufficient circulation to the brain and resulting in brain damage. He did not think that the deceased had a heart attack or myocardial infarction.

Dr. Salky noted that the autopsy showed that the deceased had hypertensive cardio vascular disease (disease of the heart and blood vessels due to high blood pressure), enlargement of the heart, hardening of the arteries, occlusion of the arteries, and severe coronary artery disease. The deceased also had interstitial myocardial fibrosis, which means that there had been episodes in the past of not enough oxygen going to the heart muscle, resulting in scarring of the heart muscle.

Dr. Salky testified that he was informed by appellant's attorney that the deceased was working in a high-temperature area. He said that a hot, humid atmosphere puts an extra strain on the heart. He stated, however, that a cardiac arrest can occur without warning under many circumstances, sometimes even in a person's sleep, sitting in a chair, etc. Dr. Salky opined that "it is extremely difficult to ascribe such a death to environmental and working circumstances" because of the situation where cardiac arrest can occur at almost anytime. He testified that if one has a propensity to cardiac instability regarding its rhythm and has some underlying heart disease, then strenuous physical exertion in a very hot environment may contribute to cardiac arrest, so he "really can't say why Mr. Bearden had a cardiac arrest, but I can say that those circumstances (excessive heat and exertion) may have put an extra strain on his heart and may have contributed to his problem."

We note here that there was no evidence that Mr. Bearden was working in a hot, humid atmosphere. Nor was there evidence of strenuous physical exertion. The uncontradicted evidence is to the contrary.

Dr. Salky testified that why a patient will suffer a cardiac arrest at a specific time is unknown. Perhaps emotional stress has something to do with it. This is something which cardiologists have observed for quite some time. The lay evidence was that the deceased was under stress from the breakup of his marriage.

Dr. Robert Peace, a pathologist who was involved in the autopsy on the deceased, testified on behalf of the employer. Dr. Peace judged that the cause of death was hypertensive encephalopathy. Other findings were minor and did not contribute to his death. Hypertensive encephalopathy is associated with uncontrolled or poorly controlled hypertension (high blood pressure). Hypertension affects the heart by causing enlargement and hypertrophy of the heart muscle. It affects the brain by causing degenerative changes in the blood vessels and even thrombosis and occlusion of small blood vessels by fibrin over areas of degeneration and necrosis of the blood vessel wall. It is manifested clinically by a variety of things, including loss of consciousness or loss of function of some part of the cerebral cortex. Pathologically it is manifested by enlargement of the brain, and microscopically shows degenerative changes in small blood vessels or capillary-size blood vessels. These degenerative changes in the blood vessels of the brain were present at autopsy. Dr. Peace further testified that the hypertension had led to severe coronary artery disease. The right coronary artery was narrowed to approximately 80%, which is sufficient to be considered a basis for postulated arrythmia and would be sufficient in itself to assign as the cause of death. Dr. Peace felt that the most likely cause of the collapse on October 23, 1978, was cardiac arrythmia, or quite possibly he might have had an acute sudden elevation of blood pressure or sudden change of blood pressure other than that due to arrythmia, and would cause the brain to become swollen and edematous and cause loss of consciousness or fainting. Dr. Peace specifically testified that he could find no evidence to indicate that Mr. Bearden's collapse and resulting death were contributed to by his work.

Dr. Walter K. Hoffman, a specialist in cardiology, testified on behalf of the employer. He agreed that the cause of death was hypertensive encephalopathy. Dr. Hoffman testified that there was no relationship between the events that led to Mr. Bearden's death and his working conditions or environment. He said that hypertension is caused primarily by genetics and is aggravated by such things as alcohol and smoking.

The trial judge, in an oral finding of fact, stated:

"Now the Court finds that on the day of his collapse the deceased was a male black thirty-nine years of age suffering

from heart disease and hypertension; that he was working under normal stress performing his usual duties in a normal environment when he suffered a heart stoppage of some type related to his heart condition; that the heart was set back in motion by CPR efforts and that he suffered partial brain damage at that time; and further heart stoppage resulting from pulmonary embolism while confined in the hospital caused brain death and possibly caused hemorrhange (sic) to his brain stem and his eventual demise.

Now the Plaintiff has chosen to proceed in this case, as far as the proof is concerned, in establishing a causal connection between the incident and the employment on the circumstances of the date.

It's the finding of this Court that he has been unable to carry the burden of proof to establish that causal connection in that form. In all cases his hypotheticals with regard to causal connection given to his own witnessess (sic) were involved in or included elements which were not brought out or proven by the testimony in this cause.

Therefore, on that basis, the Court must find for the Defendant in this case."

In arguing the two issues attacking the sufficiency of the evidence to support the trial court's findings, the appellants argue that "the issue of how the incident occurred is raised by virtue of the disagreement between the doctors." The appellants then state that by applying certain interpretations and conclusions to some of the medical testimony, the trial judge "could have" found that the deceased's injury resulted from a cardiac arrhythemia (sic) which "could have" resulted from the work environment. The appellants also argue that if the trial judge had accepted the version that the deceased struck the back of his head when he fell, then the blow "could have contributed to the cardiac arrest." The appellants also argue that there was evidence of a delay in getting the deceased to a hospital, and that this delay prevented his recovery.

The appellants review numerous cases and erroneously conclude that the law in this State is that "An employee who suffers a heart attack while on the job, is covered by the Workmen's Compensation Act, even if he is engaged in only ordinary exertion."

■ This statement is inaccurate. There must be a causal connection between the heart attack and the employment; there must be an unexpected result. *Travelers Insurance Co. v. Evans*, 221 Tenn. 199, 425 S.W.2d 611 (Tenn.1968); *Tibbals Flooring Co. v. Stanfill*, 219 Tenn. 498, 410 S.W.2d 892 (1967).

■ In general, the theme of the appellants' argument is that it was the duty of the trial judge to find in their favor if there was any evidence that would permit him to do so. This is an incorrect assumption. In *Parker v. Ryder Truck Lines, Inc.*, 591 S.W.2d 755, 759, 760 (Tenn.1979), this court, speaking through Mr. Justice Harbison, said:

"The function of a trial judge in deciding workmen's compensation cases is no different from that in any other civil action. The burden of proof rests upon the party claiming the benefits of the Workmen's Compensation Act to establish the claim by a preponderance of all the evidence. An award may not be based upon conjecture; it must be based upon material evidence, and the rules of evidence are applicable. Nothing in the Workmen's Compensation Act directly or indirectly requires a trial judge to depart from his traditional and important functions in weighing evidence and resolving conflicts therein. Testimony of witnesses should be evaluated in these cases, as in all others, upon the basis of the reasonableness or unreasonableness of the testimony given, the interest, bias, prejudice or lack thereof on the part of the

witnesses, their general credibility, their opportunity to see and observe and all of the other standards and criteria applicable to factual decisions in a non-jury civil action. For a trial judge to depart from these and to assert that he is required by the Workmen's Compensation Act to 'travel with' the testimony which is more favorable to the claimant distorts the foregoing principles and is inconsistent with them, particularly those pertaining to the burden of proof.

It is well settled that the courts are required to give an equitable construction to the workmen's compensation statutes themselves. T.C.A. § 50–918 expressly so requires. In its decisions over the years this Court has scrupulously and conscientiously adhered to the provisions of that statute and has undertaken to see that they are complied with. In doing so, and particularly in giving its rationale for appellate decisions, the Court has frequently made reference to a liberal interpretation or construction of the Act. Properly construed, however, these statements refer to the coverage of the Act, not to questions of burden of proof or accepting the testimony of witnesses for one side as against those of the other."

\* \* \* \* \* \*

"Nothing in any of the cases, however, in our opinion, justifies a trial court in concluding that the workmen's compensation statute itself, or a liberal interpretation thereof, imposes a duty upon him that he 'must travel' with the witnesses favorable to the employee and reject countervailing testimony. All of the evidence offered in the trial court must be weighed and valued by the trial judge and a proper resolution thereof made according to the fundamental principles above delineated and not because of any legal requirement that they be resolved in any particular way by the provisions of the Workmen's Compensation Act."

■ On appeal, the Supreme Court does not reweigh the evidence in Worker's Compensation cases. This court determines only whether the findings of the trial judge are supported by material evidence; it matters not to this court that the preponderance, or greater weight, or better evidence may have been contrary to the trial judge's findings. *Dailey v. Russann Lumber Company,* 590 S.W.2d 933 (Tenn.1979); *Pacific Emp. Ins. Co. v. Booker,* 553 S.W.2d 586 (Tenn.1977). There is abundant and overwhelming material evidence to support the trial judge's findings that causal connection between the employment and the death of the deceased was not proved by a preponderance of the evidence.

The appellants say that the trial court abused its discretion in refusing to allow them to make final argument. We do not find that this occurred.

■ At the close of the plaintiff's proof, the defendants moved for a dismissal on the ground that there was no medical proof sufficient to establish causal connection between the death and the employment. After hearing extensive argument, the trial judge overruled the motion. The defendants below introduced the depositions of Drs. Peace and Hoffman. The trial judge indicated that he needed to read these depositions, as well as other medical evidence, and review the law on the causal connection question. At the conclusion of the hearing, the appellant's counsel offered to make final argument on the causal connection issue but the court had not read all of the medical proof and suggested that argument would be heard when court reconvened. At the invitation of the court, the appellants filed a lengthy and comprehensive brief arguing their theory of the law and fact on the critical issues. When court reconvened, the trial judge stated his findings of fact and conclusions of law. No further argument was offered by the appellants. Thus, the trial judge did not "refuse" further final argument. We find no abuse of discretion or merit in this issue.

■ The next issue is that the trial court erred in finding that hypothetical questions

posed by the appellants assumed facts not in evidence. In stating his findings of fact, the trial judge observed that the hypothetical questions required witnesses to assume facts that were not proven. It is axiomatic that hypothetical questions are improper and of no value when they assume facts not supported by the evidence at trial. *Moon v. Johnston,* 47 Tenn.App. 208, 337 S.W.2d 464 (Tenn.App.1959); *Sepaugh v. Methodist Hospital,* 30 Tenn.App. 25, 202 S.W.2d 985 (Tenn.App.1946).

■ The appellants argue that the testimony of Dr. Nathan Salky supplied evidence favorable to the appellants on the issue of causation. Dr. Salky was asked to comment on what events might have brought on the cardiac irregularity. He responded as follows:

"The only thing that I know about those circumstances is what I have learned from correspondence with you (appellant's attorney), and that is that at the time of his collapse Mr. Bearden was working in his usual place of employment and was apparently working *in* what is called, quote, 'a heat box', and I don't know much about this except that evidently the *temperature is high in this area,* and I think that a cardiac arrest can occur in someone who has underlying heart disease, as Mr. Bearden had. A cardiac arrest can occur without warning under many different circumstances, and sometime even in people's sleep or while they are sitting in a chair and so forth.

I do think it is well known in medical science and cardiology that *heat, a hot, humid atmosphere, either hot or humid or both,* puts an extra strain on the heart. That is well known, and people who exercise, for example, in hot, humid weather of the summer, joggers and so forth, have to cut down on the amount of exercise that they do because there is extra strain and extra work for the heart to do in hot and humid conditions, and so in a letter that I wrote to you dated March 17, 1980, I think I put it this way, that *it is extremely difficult to ascribe such a death to environmental and working circumstances* because of the situation where cardiac arrest can occur at almost any time. Nevertheless, if one has a propensity to cardiac instability regarding its rhythm and has some underlying heart disease, *then strenuous physical exertion in a very hot environment* may contribute to cardiac arrest, and I believe that is true, so I really can't say why Mr. Bearden had a cardiac arrest, but I can say that *those circumstances* may have put an extra strain on his heart and may have contributed to his problem." (Emphasis added)

Immediately following the above testimony, the appellants asked Dr. Salky the following hypothetical question:

"Dr. Salky, assuming that Mr. Bearden was afflicted with the heart disease that you previously discussed, and assume that he was working in a large enclosed area near *a heating apparatus,* and assuming that he was working on an assembly line and had worked for several hours that day on that assembly line, and also assuming that it was not his practice to work for long periods of time on the assembly line and that his regular duties were merely supervisory, would it be a fair statement to say that his working in that manner with the physical ailments that he was possessed of could have contributed to his cardiac arrest?" (Emphasis added)

The form of this question did not dispel the witness's erroneous belief that Mr. Bearden was working "in" a heat box in a high temperature area. The evidence was that the heat box did not significantly affect the temperature where Mr. Bearden was working. Moreover, there was no evidence that Mr. Bearden had worked for "several hours" that day on the assembly line and there was no evidence that it was not Mr. Bearden's practice to work for long periods of time on the assembly line. The

evidence was undisputed that his duties were not restricted to that of an observer-supervisor; he frequently worked on the assembly line. The appellants have failed to point out any evidence from the record that would support these assumptions and we have found none.

In a hypothetical question asked to Dr. Peace, the appellants asked him to make similar assumptions, including the assumption that the temperature in the building was 98°. The record is devoid of evidence of the facts that these witnesses were asked to assume. The evidence in the record is contrary to the assumed facts.

In another issue, the appellants say that the trial judge should have taken judicial notice of the temperature of the "heat box" and the temperature inside the plant at the time of the alleged accident.

The appellants cite *Nashville Bridge Company v. Todd*, 199 Tenn. 311, 286 S.W.2d 861 (1956) for the proposition that the trial judge should have taken judicial notice of the temperature inside the plant. In the *Nashville Bridge Co.* case, an employee was working in a steel compartment 12 feet deep in a barge with only one hole in each compartment and a 20-inch fan at each hole that forced air down into the compartment. This court observed that "the evidence shows, and it is a commonly known physical fact that the temperature inside the compartment on warm days especially, would be higher than the outside temperature." We do not construe this statement to mean that the court took judicial notice of the temperature inside the barge hold; rather, the physical facts furnished circumstantial evidence that the temperature in these steel compartments would be higher than the outside temperature. That there was no evidence as to excessive heat was determinative, the court said, "all that the proof shows is that outside temperature was 82° on this day and that inside the hold it was some undetermined degree warmer and that a fan forced in fresh air, but there is no proof that Mr. Todd was too hot."

As in the *Nashville Bridge Co.* case, there is no proof that Mr. Bearden was working in a hot temperature. As stated in the above summary of the evidence, the proof is to the contrary. There is no legal basis for taking judicial knowledge of the temperature inside the building where Mr. Bearden worked. It might well be that the temperature was lower inside the well-ventilated building than in the sunshine outside.

All of the issues presented are overruled and the judgment of the trial court is affirmed. Costs are adjudged against the appellants.

FONES, C.J., and BROCK, HARBISON and COOPER, JJ., concur.