# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

STEVE MAKRIS, )
)
        Plaintiff/Appellant, ) Shelby Chancery No. 106635-1 R.D.
)
VS. ) Appeal No. 02A01-9712-CH-00318
)
BOB KAPOS, )
)
        Defendant/Appellee. )

FILED

December 4, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

### APPEAL FROM THE CHANCERY COURT OF SHELBY COUNTY
### AT MEMPHIS, TENNESSEE
### THE HONORABLE NEAL SMALL, CHANCELLOR

**JAMES A. JOHNSON, JR.**
**HANOVER, WALSH, JALENAK & BLAIR, PLLC**
Memphis, Tennessee
Attorney for Appellant

**LEO BEARMAN, JR.**
**BAKER, DONELSON, BEARMAN & CALDWELL, P.C.**
Memphis, Tennessee
Attorney for Appellee

**REVERSED AND REMANDED**

**ALAN E. HIGHERS, J.**

**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**DAVID R. FARMER, J.**

    Steve Makris appeals the trial court's denial of his claim for accrued and unpaid

salaries in this partnership accounting and dissolution case. For the reasons stated hereafter, we reverse the trial court's judgment.

### Facts and Procedural History

In 1987, Steve Makris (Makris), Bob Kapos (Kapos), Demitris Vavouris (Vavouris), and Michael Sargent (Sargent) entered into a partnership named "the Almadura Group." The two partners who are parties to this case, Makris and Kapos, also had been, and remain, partners in numerous other business enterprises. The four partners in the Almadura Group entered into a written partnership agreement that established each partner's interest as being equal and provided, among other things, "No partner shall receive any salary for services rendered to the Partnership except as otherwise approved by a majority of the Partners."

The partnership purchased and renovated a 52-unit apartment complex known as the Almadura Apartments. Construction and renovation to the property began in August, 1987, and was substantially completed by the end of November, 1988. At the beginning of this period of construction, the partnership orally agreed to hire Sargent to oversee the construction and to pay him a salary of $500 per week. During the period of Sargent's duties, Makris participated in the oversight of Sargent's work and also maintained the partnership's checkbook and records.

Sargent's oversight over the construction and his accompanying $500 per week salary lasted only two and one-half months, however, because the other three partners became dissatisfied with Sargent's services and performance. Eventually, in 1988, Sargent's one-fourth interest in the partnership was "bought out" by the other three partners. Though the money that was used to buy out Sargent's interest originally came from Kapos, the transaction, like all other subsequent monetary contributions from any of the remaining three partners, actually created a partnership debt owed to Kapos, and the remaining three partners' interests remained equal.

2

At some point after Sargent's oversight over the construction was ended, the partnership orally agreed for Makris and Kapos jointly to assume those duties for which Sargent had been responsible. Also, the partnership orally agreed that both Makris and Kapos would "draw" a salary of $350 per week. During the period of construction wherein Makris and Kapos took over Sargent's former duties, Makris generally worked between approximately 70 and 80 hours per week. The joint responsibility during the construction phase lasted from October, 1987 until construction was near completion. According to Kapos, during mid-October 1988, when construction was nearing completion, Kapos instructed Makris to take the entire amount that was being drawn for salaries ($700) through the end of the year because Kapos was going to be out-of-town for a while. Kapos further claims that, after the 1987-88 salaries accrued, both Makris and Kapos stopped earning these salaries.

After the renovation and construction ended by the end of November 1988, Makris continued to manage business affairs at the Almadura Apartments, though the work that Makris performed after renovation was generally different in nature because it involved more day to day operations and maintenance of the apartments. Makris continued managing day-to-day affairs of the apartment complex until November of 1993. According to Makris, during the entire period of time in which Makris managed business affairs at the Almadura Apartments, his average time spent working for the partnership never fell below 40 hours per week. However, during 1992 and 1993, his managerial involvement at the apartments changed because he hired a resident manager during those years.

On March 27, 1989, interest payments were made by the partnership to each partner, though the partnership lacked sufficient funds to repay any additional amounts that the partners had contributed or loaned to the partnership. By agreement, the interest that was paid to each partner was at the rate of ten percent and was based upon a combination of any amounts that the partner had loaned to the partnership and any other amounts that the partnership owed to that partner. Vavouris's interest payment was based solely upon amounts that Vavouris had contributed or loaned to the partnership, while Makris's and

3

Kapos's interest payments were based upon amounts contributed or loaned to the partnership *plus* unpaid salaries that had accrued through the end of 1988. Makris's unpaid accrued salary was accounted for as being $26,750, which represented 65 weeks (August 1987 through the beginning of November 1988) at $350 per week and 8 weeks (November and December 1988) at $500 per week. Kapos's unpaid accrued salary was accounted for as being $18,200, which represented 52 weeks (October 1987 through October 1988) at $350 per week. No dispute exists regarding these amounts. It is further undisputed that, after these first interest payments were made, ten percent interest continued to accrue on any amounts owed by the partnership to each partner.

Also in March 1989, Vavouris commenced a lawsuit against Makris, Kapos, and the partnership. In May 1989, at Kapos's request, Makris drafted a letter that was addressed to and sent to Vavouris. This letter stated, in part:

> Partner Steve Makris continues to ... fill the slot of Resident Manager and is at the property daily during business hours as well as weekends and on call 24 hours a day.
>
> . . . .
>
> [I]n view of the totally disproportionate contribution of time to the partnership by the partners, it seems reasonable that the following compensation be approved
>
> | | |
> |---|---|
> | Steve Makris | $500.00 per week |
> | Bob Kapos | $ 10.00 per hour |

Though the letter contemplates a "proposal" for compensation to Makris and Kapos, Makris explained at trial that the only change that Kapos sought via the letter was to add the $10.00 per hour agreement for Kapos's benefit. At trial, Makris explained that Makris's $500.00 per week salary was already agreed upon and in effect at the time of the letter to Vavouris. According to Makris, he expressed to Kapos that he preferred not to put his own salary figure in the letter because he viewed that issue as already being settled, but that Kapos instructed Makris to put it in the letter anyway. In fact, at trial, Makris testified that he and Kapos had discussed his services at the apartments and his entitlement to a salary on several occasions, both before and after the May 1989 letter. Further, he testified that he and Kapos had agreed both prior to and after the May 1989 letter that he would be entitled to $500 per week salary for his services. In fact, according to Makris, a meeting

4

that was referred to and contemplated by the May 1989 letter was held after the letter, though Vavouris did not appear, and Makris and Kapos, constituting a quorum, reaffirmed Makris's $500 per week salary.

At trial, Kapos similarly testified that a partnership agreement (a majority agreement as between the three partners) for Makris to receive a $500 per week salary was reached as of May 27, 1989. Kapos contends, however, that he also reached a *separate* agreement with Makris at the same time, whereby Makris would continue managing the Almadura apartments and would receive only $500 per month for salary so that the unprofitable business could "survive."

Beginning in June 1989, Makris, who generally handled the partnership books and checkbook, drew $500 per month for compensation for his services. As mentioned, Makris claims that he was actually accruing $500 per week in salary, but that he was only paid $500 per month because the partnership was not profitable and could not afford to pay him $500 per week and because he needed the $500 per month to offset some of his own expenses.

During the course of the Vavouris litigation, Makris asserted a claim for unpaid accrued salaries based upon a rate of $500 per week. Based on Kapos's own testimony, he did not object to Makris's claim for $500 per week accrued salaries in the Vavouris litigation. In fact, in the Vavouris litigation, Kapos testified that Makris had been earning $500 per week in salaries and that such amount was fair.

During the course of and in the defense of the Vavouris litigation, at Kapos's request, Makris prepared two handwritten spreadsheets detailing all amounts owed by the partnership to each partner. The first spreadsheet was dated June 30, 1989 and the second spreadsheet was prepared for the end of 1989. Though the June 1989 spreadsheet was not introduced at trial, the December 1989 spreadsheet, which was introduced, included a specific entry for unpaid accrued salaries for Makris at $500 per

5

week.[1] The spreadsheet also reflected accrued interest at the rate of ten percent for the 1989 unpaid accrued salaries. Makris further claims that he provided a copy of this spreadsheet to Kapos, discussed the spreadsheet with him, and that Kapos raised no objections to Makris's entries for unpaid accrued salaries and interest thereon. Kapos, however, claims that this spreadsheet was not provided to him.

The Vavouris litigation was settled in August 1993, at which point Vavouris was paid for the transfer and/or termination of his partnership interest. After the transfer and/or termination of Vavouris's interest in the partnership, Makris and Kapos remained equal partners, though they were now "50/50" partners. Shortly after Vavouris's interest in the partnership ended, Makris and Kapos again discussed financial matters, including the issue of salaries. In November 1993, Kapos requested, and Makris provided, updated calculations of amounts owed by the partnership to both Makris and Kapos. Like the earlier spreadsheet from December 1989, these calculations accounted for unpaid accrued salaries for Makris based on a $500 per week rate and accrued interest based on a ten percent per annum rate. Two or three days later, Kapos requested Makris to discontinue his management duties. Accordingly, Makris ended his managerial services. Also, the resident manager left. Thereafter, Kapos attempted to personally manage the apartments. After two months, however, Makris notified Kapos that he did not agree to have Kapos continue managing the business. Therefore, a private management company was hired to manage the apartments.

On November 5 and 6, 1997, the case was tried without a jury. Though other issues were presented in the trial court below that are not before this Court on appeal, the case primarily concerned Makris's claim for accrued and unpaid salaries for his services from January 1, 1989 through November 30, 1993, based upon a $500 per week salary. As mentioned earlier, it was undisputed that any amounts owed by the partnership to each partner accrued interest at the rate of ten percent, and that there had been no discussions or agreements to alter this accrual of interest. At trial, Makris explained that, once he

---

1. The amount of "unpaid salary" for 1989 that was listed on the spreadsheet was $21,000, which represents $500 per week minus the $500 per month that Makris already received.

began accruing $500 per week in November and December 1988, there were no subsequent agreements to change that arrangement and that he continued accruing salary at $500 per week until November 1993. Moreover, Makris testified that there were many discussions affirming his $500 per week salary arrangement. Makris further explained at trial that he had been drawing only $500 per month because the business had not been earning enough money to pay any additional amounts for salary.

At trial, a December 31, 1991 partnership balance sheet was also introduced that set forth, among other things, "notes payable" owed by the partnership to each partner and creditor. The amount listed as payable to Steve Makris reflected a total amount that included the earlier $26,750 of unpaid accrued salary from August 1987 through December 1988 and other amounts that Makris had contributed that the partnership owed to him. The amount listed as payable to Steve Makris did *not* reflect any unpaid salary accrued after December 1988. Makris explained, however, that no additional amounts for his claimed unpaid accrued salary went on the books of the partnership because of the pending Vavouris litigation (Vavouris was contesting Makris's claim for unpaid accrued salaries) and because he did not want to pay taxes on amounts that he did not actually receive and might not ultimately receive,[2] considering the partnership's unprofitable history. Accordingly, Makris did not pay any individual federal income tax on any unpaid salary accrued from 1989 through November 1993.

Similarly, a December 31, 1996 partnership balance sheet, which was prepared by the partnership's accountant, was introduced at trial that likewise did not reflect any amounts for unpaid salary accrued after December 1988.[3] At that point, however, Kapos had been handling the partnership "books" since the breakdown in relations in 1993. Furthermore, the Vavouris litigation was still pending and the partnership was still not

_____

2. Notes and other evidences of indebtedness received in payment for services are includable in gross income for individual federal income tax purposes. Treas. Reg. § 1.61-2(d)(4). Makris reported the earlier $26,750 that was earned from August 1987 through December 1988 as taxable income. He did not, however, report any subsequent amounts of unpaid accrued income (as a note payable) as taxable income.

3. Interestingly, both the December 1991 and the December 1996 balance sheets also failed to account for unpaid accrued interest on amounts owed to the partners. As mentioned earlier, however, such interest on any amounts owed to partners undisputedly accrued at a rate of ten percent per annum.

7

profitable.

> After trial, the trial court ordered the following:
>
> Plaintiff's prayer for a declaratory judgment to the effect that Plaintiff is entitled to place on the partnership books an account payable reflecting salary of $500 per week accruing from 1989 through 1993 is denied. Plaintiff's claim for such salary and interest on that salary is therefore denied.

After the trial court denied a subsequent motion to reconsider and amend that was filed by Makris, Makris appealed. Though an outline of Makris's arguments is set forth in his appellate brief in lieu of a proper statement of the issues presented for review, appellant has raised and briefed the following issue:

> Whether the Almadura Group entered into an oral agreement entitling Makris to $500 per week as salary for his managerial services performed at the Almadura apartments after 1988.

### *Analysis*

Generally, under Tennessee's Uniform Partnership Act, "No partner is entitled to remuneration for acting in the partnership business." Tenn. Code Ann. § 61-1-117(6) (Supp. 1998). This principle, however, is expressly subject to any agreement between the partners of a partnership. Id. § 61-1-117. Accordingly, in the instant case, Makris is not entitled to the salaries that he is claiming *unless* such salaries were provided for pursuant to a partnership agreement.

As this Court previously recognized in Aussenberg v. Kramer, 944 S.W.2d 367 (Tenn. App. 1996), partnership agreements can be either written or oral. 944 S.W.2d at 371. The Almadura Group's original written partnership agreement established, "No partner shall receive any salary for services rendered to the Partnership except as otherwise approved by a majority of the Partners." Therefore, resolution of the case before this Court centers upon whether any written or oral agreement, establishing Makris's entitlement to a $500 per week salary after 1988, was reached by a majority of the partners at some point after the execution of the written partnership agreement. Our review of this issue is *de novo* upon the record, accompanied by a presumption of correctness as to the

8

trial court's finding, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d)

Initially, we note that Makris claims that he is entitled to unpaid salaries dating back to January 1989. According to Kapos's testimony, however, the agreement for salaries that was made during the partnership's construction phase (during 1987 and 1988) entitled Makris to receive salaries only through the end of December, 1988, and that no agreement provided for his continued receipt of salaries immediately following the construction phase. We find that the preponderance of the evidence does not weigh against the trial court's refusal to award Makris with unpaid salaries dating back to January 1989. To the extent that Makris's claim for unpaid salaries pertained to the period from January 1, 1989 through May 27, 1989, the trial court's determination hinged upon the credibility and weight of the oral testimony from both Makris and Kapos, and, accordingly, we afford considerable deference to the trial court's finding. See Humphrey v. David Witherspoon, Inc., 734 S.W.2d 315, 315 (Tenn. 1987).

Upon careful review of the entire record in this case, however, including all of Kapos's testimony, we find that the preponderance of the evidence weighs against the trial court's complete denial of Makris's claim for unpaid salaries. As we explained above, Kapos testified at trial that a partnership agreement (a majority agreement as between the three partners) for Makris to earn a $500 per week salary was reached as of May 27, 1989. This testimony from Kapos *supports* Makris's testimony and claim for unpaid salaries.

Kapos further testified that he reached a *separate* agreement with Makris at the same time, whereby Makris would continue managing the Almadura apartments and would receive only $500 per month for salary so that the unprofitable business could "survive." Such an agreement is not necessarily inconsistent with the partnership agreement, because Makris could earn $500 per week, while drawing only $500 per month (thereby accruing unpaid amounts). Kapos, however, contends that the separate $500 per month agreement somehow limited the total amount that Makris was actually earning. In addition

9

to Kapos's testimony in the instant case pertaining to the existence of a $500 per week agreement, Kapos testified in the prior Vavouris litigation that Makris had been earning $500 per week in salaries and that such amount was fair. The Tennessee Supreme Court has recognized, "Contradictory statements of a witness in connection with the same fact have a result of cancelling out each other." Tibbals Flooring Co. v. Stanfill, 410 S.W.2d 892, 896 (Tenn. 1967); State v. Jones, 598 S.W.2d 209, 213 (Tenn. 1980). See also 29A Am. Jur. 2d, *Evidence* § 1444 (1994) ("where a party without reasonable explanation testifies to facts materially different concerning a vital issue . . . , that evidence is discredited as a matter of law and should be disregarded"). Accordingly, even assuming portions of Kapos's testimony were construed as a complete denial of Makris's entitlement to accrued salaries at the rate of $500 per week, Kapos's own testimony expressly contradicted any such complete denials, thereby "cancelling out" these denials. Therefore, the preponderance of the evidence establishes that Makris earned $500 per week as salary, though considering Kapos's testimony, Makris did not begin earning such salary until May 27, 1989.

However, even though Makris asserts that he should be entitled to $500 per week salary through November 1993, we do not concur. Though the May 1989 letter does not, standing alone, represent the $500 per week agreement, we find the letter to include credible proof concerning the terms of the $500 per week salary agreement. More specifically, we note that the letter justifies Makris's $500 per week salary by the fact that Makris "fill[ed] the slot of Resident Manager," in addition to performing other managerial services. Accordingly, we find that Makris's right to receive $500 per week as salary was conditioned upon his fulfillment of, among other things, those duties and responsibilities that would have been required of and performed by a resident manager. Makris's own testimony established that he hired a resident manager during 1992 and 1993. Though this resident manager was paid considerably less than $500 per week,[4] the resident manager's salary and "rent-free" apartment were provided at partnership expense. Therefore, we find that Makris is not entitled to $500 per week salary for the period during

---

4. The resident manager received $75 per week salary plus an apartment, valued at $400 per month.

10

which a resident manager was employed to provide services that Makris had previously been providing.[5] Accordingly, we find that Makris is entitled to $500 per week salary for the period running from May 27, 1989 through December 31, 1991, *minus* the $500 per month that he previously "drew" for salary.

### *Conclusion*

Based upon the foregoing, the trial court's denial of Plaintiff's prayer for a declaratory judgment to the effect that Plaintiff is entitled to place on the partnership books an account payable reflecting salary of $500 per week accruing from 1989 through 1993 is hereby reversed, the trial court's denial of an award of such salary and interest on that

salary is hereby reversed, and this cause is hereby remanded to the trial court for such further proceedings as may be necessary in accordance with the foregoing. Costs of this appeal are taxed to Kapos, for which execution may issue if necessary.

_____
HIGHERS, J.

CONCUR:

_____
CRAWFORD, P.J., W.S.

---

5. As further support of for our conclusion, we note that Kapos's testimony from the Vavouris lawsuit, wherein Kapos stated that Makris had been earning $500 per week salary, was given at a time *prior* to the employment of a resident manager. We also note that, even though Makris clearly continued providing managerial services *after* the employment of a resident manager, he also continued receiving $500 per month for his services. Last, we note that Kapos also provided managerial and maintenance services, though to a lesser degree, throughout most of the period in question (from January 1989 through November 1993).

FARMER, J.